William JOHNSON, by his conservator, Richard Johnson, on his own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Terry B. BRELJE, Ph.D., Superintendent of Chester Mental Health Center, Robert DeVito, Director, Illinois Department of Mental Health and Developmental Disabilities, Defendants.

No. 78C1704.

United States District Court, N. D. Illinois, E. D.

Aug. 18, 1981.

Susan M. Sitter, Maywood, Ill., Thomas Grippando, Edward Beis, Chicago, Ill., for plaintiffs.

Maureen D. Mudron, Christine A. Bremer, Alan E. Grischke, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff brings this action on his own behalf and on behalf of a class of persons previously certified by this Court, 482

F.Supp. 121,[1] against two employees of the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD").[2] Plaintiffs allege that those male patients charged with crimes and found unfit to stand trial[3] ("USTs") who are assigned to the Chester Mental Health Center, or who are transferred to Chester from a less restrictive facility, are assigned in violation of procedural due process. Plaintiffs further allege that they were deprived of equal protection because, unlike other civilly committed patients, they were not given periodic reviews regarding their need for continuing treatment. Additionally, plaintiffs assert that the placement of male USTs at the Chester facility, while female USTs are assigned to the less restrictive Elgin facility, constitutes discrimination on the basis of gender. Finally, plaintiffs challenge the constitutionality of certain of the conditions at the Chester facility. This matter is currently before the Court on cross motions for summary judgment.

## I. *Procedural Due Process Claims*

Plaintiffs assert two related procedural due process claims. First, they contend that their initial assignment to Chester, after being designated as USTs, was made without procedural protections. Next, they assert that certain plaintiffs were transferred from less restrictive facilities such as the Mantino Mental Health Center to the more restrictive Chester facility without due process. At the heart of both these claims is the fact that plaintiffs were assigned to the maximum security Chester facility without there having been any individualized finding by the defendants that plaintiffs were dangerous or in need of a highly restrictive setting.

The fourteenth amendment prohibits a state from depriving a person of life, liberty, or property without due process of law. The initial inquiry must concern whether the actions complained of infringe or implicate a liberty interest accorded by either state or federal law. *Meachum v. Fano*, 427 U.S. 215, 223, 96 S.Ct. 2532, 2537, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In *Meachum*, the Supreme Court held that given a valid criminal conviction, a prisoner's liberty interests are "sufficiently extinguished ... to empower the State to confine him in *any* of its prisons." *Id.*, 427 U.S. at 224, 96 S.Ct. at 2538. Accordingly, the Court found that prisoners transferred to a prison where conditions are considerably less favorable, *Meachum, supra*, and prisoners subjected to disciplinary transfers, *Montanye, supra*, do not have their liberty interests implicated by virtue of the transfers, and consequently, need not be accorded due process protection.

The holdings in *Meachum* and *Montanye*, however, are predicated on two factors: (1) that convicted criminals have their liberty interests extinguished to a significant degree by virtue of their conviction, and (2) that plaintiffs in those cases could not establish any foundation in state or federal law or practice for the liberty interest that they attempted to assert. It is essential to note that in the instant case, plaintiffs have not been convicted of any crime and their institutionalization is meant to serve thera-

---

**1.** The definition of the class certified in Count I is as follows:

    all male persons who have been and/or may be hospitalized pursuant to the Illinois Mental Health Code and/or the Illinois Code of Corrections after being found not fit to stand trial by an Illinois Court and solely because of said finding are transferred to Chester Mental Health Center.

The definition of the class certified in Count II is the following:

    all persons who are/or will be found to be unfit to stand trial because of a finding of to be in need of mental treatment or by opera-

tion of the Illinois Code of Corrections after being found not fit to stand trial by an Illinois court and solely because of said finding are transferred to Chester Mental Health Center.

**2.** The pertinent facts in this case are detailed in this Court's earlier opinion. *Johnson v. Brelje*, 482 F.Supp. 125 (N.D.Ill.1979).

**3.** "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." Ill.Rev.Stat., ch. 38, ¶ 104–10 (1980).

peutic as well as security purposes. Moreover, plaintiffs have identified specific statutory provisions which create justifiable expectations that they would not be assigned to the Chester facility, except upon the occurrence of certain specified events.

■ As we stated in our earlier opinion, the precise nature of the procedural due process protections required in a given situation depends upon the extent to which plaintiffs might suffer "grievous loss," a question which requires an examination both of the governmental function involved and the private interest affected. *Johnson v. Brelje*, 482 F.Supp. 125, 131 (N.D.Ill. 1979), *citing Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). As indicated in *Meachum, supra*, 427 U.S. at 224, 96 S.Ct. at 2538, once a court has decided that confinement is necessary, the State is to be given broad initial discretion in its decision regarding where a person is to be confined. But, unlike convicted criminals, plaintiffs can justifiably expect that their assignment will be based upon an individualized determination of their dangerousness, conducted prior to placement. This expectation is rooted in the provision of the Illinois Mental Health Code that requires patients to be treated in the least restrictive environment possible, according to an individualized service plan. Ill.Rev.Stat., ch. 91½, § 2–102 (1980); *Johnson v. Brelje, supra*, 482 F.Supp. at 132.

■ Plaintiffs who reside at a less restrictive facility and who are transferred to the maximum security Chester facility, also have justifiable expectations rooted in state law and practice that they will not be transferred to a more restrictive facility absent an individualized finding that transfer is consistent with their treatment needs. That expectation arises from a variety of sources including Ill.Rev.Stat., ch. 91½, § 2–102. As pointed out in our earlier opinion, the Illinois Mental Health Code provides that civilly-committed patients can be transferred only if such a transfer is consistent with the treatment needs of the patient and only after the patient is provided with notice and an opportunity for a

hearing. *Johnson v. Brelje, supra*, 482 F.Supp. at 131; Ill.Rev.Stat., ch. 91½, §§ 3–908, 3–910 (1980). Moreover, defendants have admitted that once a UST is determined to be no longer in need of a secured setting, he will be placed in the unsecured DMHDD facility closest to his residence, where restrictions on his liberty are lifted. Defendants' Memorandum in Support of Motion for Summary Judgment at 35. It is somewhat incongruous, then, for the State to find a patient to be no longer in need of a secured facility, transfer him to a less restrictive facility, and then transfer him back to the maximum security facility merely for administrative convenience—which is what happened in this case to plaintiff William Johnson. Given the Illinois statutes and the State's practice regarding the transfer of USTs, the Court finds it justifiable for a UST to expect that he will not be transferred from a less secured facility to a more restrictive facility unless it is consistent with his treatment needs and in response to his need for a more secured setting. Accordingly, it is clear that in accordance with the standards established in *Meachum* and *Montanye*, plaintiffs who initially were assigned to Chester after being designated as USTs and plaintiffs who were transferred to Chester from a less restrictive facility have had their liberty interests implicated by virtue of the transfer.

Plaintiffs' procedural due process rights having been invoked, it is necessary for the Court to determine the scope of the procedural protections that must be provided. We are guided in this task by the balancing test articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and applied by the Seventh Circuit in *Anthony v. Wilkinson*, 637 F.2d 1130, 1141 (7th Cir. 1980):

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest

through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

In the instant case, the private interest involved already has been alluded to. The Chester facility is a maximum security institution that imposes severe restrictions on the movement and activities of its inhabitants. Also, because of Chester's distant location from Cook County, where most of the patients resided prior to confinement, placement at Chester means being deprived of contact with family and friends. *See Anthony v. Wilkinson*, 637 F.2d 1130, 1141 (7th Cir. 1980). The UST's interest in not being assigned or transferred to Chester without an individualized finding regarding his treatment needs and dangerousness is indeed substantial.

The procedures currently used by defendants prior to assigning a UST to Chester are relatively simple. Before initially being assigned to Chester, USTs are not provided with any notice of their assignment and are given no opportunity to challenge their assignment. The assignment is made on administrative grounds, as there is no individualized finding that a particular UST has need for, or would benefit from, placement in a facility as restrictive as Chester. USTs who are transferred from a less restrictive facility to Chester are given oral notice of the transfer and are told that they can protest the transfer, although there do not appear to be any guidelines for the processing of any protest, should one be lodged. Moreover, the oral notice is of little value, considering the fact that the notice is being given to people who have been determined to be unable to understand the nature and purpose of the proceedings against them or to assist in their defense. Ill.Rev.Stat., ch. 38, § 104–10 (1980). Consequently, it comes as no surprise that of the approximately 50 USTs who were transferred from Manteno to Chester in the fall of 1977, not a single one requested an appeal.

The final due process requirement to be considered is the government's interest. The Court is not unmindful of the difficult administrative task faced by defendants in attempting to provide treatment and security for persons residing in their institutions. The Court also is cognizant of the additional fiscal and administrative burdens that new procedural requirements may entail.

■ Nonetheless, the loss facing a UST who is about to be assigned or transferred to Chester is significant. It is comparable to that faced by the state prisoner scheduled for involuntary transfer to a state mental institution in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), or to the loss facing a state prisoner who was about to be transferred to the federal system in *Anthony v. Wilkinson*, 637 F.2d 1130 (7th Cir. 1980). In both those cases, demanding procedural protections were required because of the immediate and tangible loss faced by the prisoners.[4] Of course, every factual situation has its

---

4. The minimum due process requirements found to be necessary in *Vitek* include:

    A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

    B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

    C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination:

    D. An independent decisionmaker;

    E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

    F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; and

    G. Effective and timely notice of all the foregoing rights.

445 U.S. at 494–95, 100 S.Ct. at 1264, *quoting Miller v. Vitek*, 437 F.Supp. 569, 575 (D.Neb. 1977).

own contours and the due process protections to be imposed will vary accordingly. In the instant case, the Court finds that the following procedures must be followed to ensure that those who face assignment or transfer to Chester are provided with minimum due process: (a) written notice of proposed assignment or transfer to Chester must be provided to the patient and his attorney; (b) disclosure to the patient and his attorney of the individualized basis for the proposed assignment or transfer to Chester; (c) opportunity to contest the proposed assignment or transfer at a hearing where the patient has an opportunity to appear in person and to present witnesses and evidence in his behalf; (d) the right to confront and cross-examine witnesses unless the hearing officer finds good cause for not allowing confrontation; (e) a neutral and detached hearing body; and (f) a written statement by the hearing body as to the evidence relied upon and the reasons for the decision.

The Court concludes that only by utilizing these procedures will the interests of a patient facing assignment to Chester be adequately protected. As in *Vitek* and *Anthony*, the procedures are designed to ensure that a decision to assign a patient to Chester is consistent with the patient's individual treatment needs and reflects the patient's need for a secured setting. The opportunity to demand a hearing before a neutral hearing body is essential if the patient is to have an opportunity to question his assignment to Chester. Moreover, as the Seventh Circuit has stated, "[t]he opportunity to question would be pointless without advance notice of the basis for transfer, disclosure of the evidence upon which the officials intend to rely and an opportunity for the prisoner to present documentary and testimonial evidence." *Anthony, supra,* 637 F.2d at 1143. Providing notice to the patient's attorney assures that notice will be more than a symbolic gesture and makes the attorney aware that his client's status may be detrimentally altered by virtue of assignment to Chester. While a summation of the evidence and the reasons for decision might create some administrative inconvenience, such procedures help serve to ensure that the decision will not be arbitrary. *Anthony, supra,* 637 F.2d at 1144. Although further administrative safeguards could also be imposed, the Court believes that these requirements will adequately protect the plaintiffs without creating an undue burden upon the State.

## II. Equal Protection Claims

Plaintiffs further assert equal protection violations arising from the policy pursuant to which male USTs are assigned to the Chester facility, while female USTs are assigned to the Elgin facility. Plaintiffs claim that because Elgin is a less restrictive facility, the assignment of male USTs to Chester constitutes a form of sex-based discrimination. *See Johnson v. Brelje, supra,* 482 F.Supp. at 133. Deposition testimony has shown, however, that the only disparity in patients' rights between the two facilities arises from defendants' policy with respect to unescorted grounds passes and off grounds passes. At the Chester facility, no grounds passes or off grounds passes are issued, while at Elgin, unescorted grounds and off grounds passes may be obtained under certain circumstances.[5] Thus, in effect, plaintiffs are challenging the Chester facility's proscription against certain passes, *infra* at 731–732, under the guise of sex-based discrimination.

---

**5.** In effect, however, this does not constitute a significant disparity. At Elgin unescorted grounds and off grounds passes may be obtained if the clinicians determine that the granting of such passes would benefit the patient and not pose any danger. There is no evidence, however, that any female UST has ever received an off grounds pass at Elgin. At Chester, the patients are regularly evaluated as to their need for a security setting. Upon determination that the patient does not require a security setting, he is transferred to an unsecured facility, where the blanket restriction on passes does not exist. As a number of courts have noted, "what the Equal Protection clause requires in a prison setting is parity of treatment, as contrasted with identity of treatment, between male and female inmates." *Bukhari v. Hutto,* 487 F.Supp. 1162, 1172 (E.D.Va.1980); *Barefield v. Leach,* Slip Op. No. 10282 at 37–38 (D.N.M.1974).

In sex discrimination cases brought under the fourteenth amendment, it is necessary for the plaintiff to show that the classification reflects purposeful invidious discrimination. *Mescall v. Burrus*, 603 F.2d 1266, 1271 (7th Cir. 1979); *see also Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In determining the existence of discriminatory intent, relevant considerations include the historical background of the decision, the specific sequence of events, the departure, if any, from normal procedures, and contemporary statements by those involved in decision-making. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). In order to prevail, plaintiffs need only show that the underlying discriminatory purpose is a motivating factor; it need not be the sole, or even the dominant factor. *Id.* at 265, 97 S.Ct. at 563.

In the instant case, plaintiffs have failed to adduce any facts or circumstances which point to the existence of invidious purposeful discrimination by defendants in their decision to place male USTs at Chester and female USTs at Elgin. Instead, the reason for placing male and female USTs in different facilities and for subjecting them to different rules is purely institutional. Female USTs have been placed at Elgin because fiscal and administrative constraints have not made it feasible to open a unit for female USTs at Chester. The Supreme Court has noted, that the Fourteenth Amendment guarantees equal laws, not equal results, and that "[w]hen the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Personnel Admr. of Massachusetts v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Because defendants'

assignment of male USTs to Chester and female USTs to Elgin is based solely upon legitimate noninvidious purposes, defendants' motion for summary judgment on plaintiffs' sex-based discrimination claim must be granted.

Plaintiffs also assert that statutorily required periodic reviews of the patients' needs for continuing treatment were not made for William Johnson and other class members, thus depriving them of equal protection under the law. In an earlier opinion, this Court held that if plaintiffs were denied the periodic review required for all civilly committed persons, this denial would constitute a violation of plaintiffs' right to equal protection under the law. *Johnson v. Brelje, supra*, 482 F.Supp. at 133.

At the time of Johnson's admission as a patient identified as unfit to stand trial, the Illinois Mental Health Code of 1968 governed the conditions of his confinement. The Code required that periodic reviews be made by the superintendent of any hospital in which an involuntarily committed patient is confined, in order to ascertain whether the patient was in need of further treatment and confinement. The reviews were to be conducted "as frequently as practicable but not less than every six months." Ill.Rev.Stat., ch. 91½, § 10–2 (1977). This requirement remained in existence until January, 1979, when the new Mental Health Code became operative. Plaintiffs concede that subsequent to January 1, 1979, defendants did perform the necessary reviews.[6] Thus, the sole issue now before the Court is the factual question of whether the necessary reviews were made prior to 1979.

Neither party has adequately addressed this issue. Plaintiffs have failed to provide the Court with any evidence whatsoever to

---

**6.** The only contention raised by plaintiffs for the period subsequent to January 1, 1979, involves the hearing conducted by the Court to determine the patients' need for continued treatment and his fitness for trial. Ill.Rev.Stat. ch. 38, § 104–20. Plaintiffs assert that their rights are being violated because defendants refuse to transport USTs to their court hearings. After the conclusion of discovery, however, the parties appear to agree that USTs

rarely appear at these hearings because the patient's attorney either waives the right to the hearing (as provided for in the statute) or waives the right of the patient to appear. It is thus apparent that plaintiffs' complaint is not with defendants, who have done nothing to prevent plaintiffs from appearing at hearings, but rather with defense attorneys, who, as a matter of course, waive their clients' right to appear and testify.

indicate that they were not given semi-annual reviews. Defendants, on the other hand, have failed to show that the necessary reviews were made.[7] Accordingly, the Court is not in a position to grant summary judgment at this time for either party on this issue, since there still exists a contested question of material fact. Fed.R.Civ.P. 56(c). The parties are to meet forthwith to attempt to resolve this single remaining issue. If the parties are unable to mutually resolve this last issue, they are directed to file at the September 18, 1981, status call supplemental briefs, with supporting affidavits, as to this issue.

### III. Substantive Due Process Claims

Plaintiffs further allege that certain conditions existing at the Chester facility violate substantive due process. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court addressed the question of what due process rights were to be accorded pretrial detainees with respect to the conditions of their confinement.[8] In most respects, the patients at the Chester facility are in a position comparable to that of pretrial detainees. As is true of pretrial detainees, plaintiffs have not been convicted of any crime, but have been charged with criminal activities and are institutionalized by the state because they pose a danger to the community. In the instant case, however, the plaintiffs are both prisoners and patients. They are not institutionalized merely for security reasons, but also in order to receive treatment to render them fit to stand trial. One further distinction is that the Chester patients are institutionalized until the criminal charges lodged against them are dismissed or until they are fit to stand trial—a

period of incarceration likely to be lengthier than that served by pretrial detainees, who are merely awaiting their trial dates. While the Court recognizes the distinctions between the plaintiffs and pretrial detainees, we agree with the parties that the standards established in *Bell v. Wolfish*, provide the framework for analyzing plaintiffs' due process claims with respect to the conditions of their confinement.

As articulated in *Bell v. Wolfish, supra,* 441 U.S. at 537, 99 S.Ct. at 1873, the state has an obvious interest in plaintiffs' confinement and is entitled to employ means calculated to effectuate this detention. "[T]he fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment'." *Id.* Rather, the question is "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* Absent an "expressed intent to punish," that determination generally turns on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." (Citation omitted.) *Id.* at 538, 99 S.Ct. at 1873–74. It is within this framework that plaintiffs' allegations regarding the conditions of their confinement must be viewed.

Plaintiffs first allege that they are not provided adequate time for outdoor activities. Although the physical layout of the Chester facility contains two large outdoor courtyards and a gym and multipurpose

---

**7.** Defendants point to four pages of deposition testimony by defendant Terry B. Brelje, superintendent of the Chester facility, wherein he testified as to entries made in William Johnson's record regarding modifications of his "treatment plan." Brelje went on to testify that similar entries were made in the medical records of all members of the plaintiff class. This testimony, devoid of any reference to a review of plaintiffs' need for further confinement, is not responsive to the issue before the Court.

**8.** This issue currently before this Court is to be distinguished from that recently considered in *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), where the Supreme Court delineated the scope of prisoner's rights under the eighth amendment's proscription against cruel and unusual punishment. In the instant case, the eighth amendment is not applicable since the patients at the Chester facility have not been convicted of any crimes and accordingly are not institutionalized as "punishment."

activity room, plaintiffs have shown that patients were permitted outdoors for only a total of twenty-five hours during the course of a year and for only two hours from September 1 until March 31. In contrast to the statistics provided by plaintiffs, the defendants provided testimony indicating a policy of scheduling outdoor activities five times per week, weather permitting. Indeed, a 1978 memorandum from Chester's Director of Activity Therapy Services indicates that yard activities are to be provided for patients if the outside temperature exceeds thirty-five degrees. It is obvious from plaintiffs' uncontested statistics that while defendants may have an outdoor recreation policy on paper, it is not being followed in practice.

■ Defendants have failed to assert any reason whatsoever for their inability to provide plaintiffs with additional outdoor activities pursuant to the policy that purportedly exists at the Chester facility. Were defendants to act in accordance with their policy, plaintiffs' claim would have to be denied. But permitting patients to go outdoors for a total of twenty-five hours over the course of a year falls far short of the policy goals articulated by defendants. This Court does not suggest that the Constitution requires plaintiffs to be given outdoor activities seven days per week, but in the absence of any justification by defendants for limiting plaintiffs' access to outdoor activities, the Court must hold that plaintiffs' due process rights have been infringed, and that summary judgment with respect thereto must be entered on behalf of plaintiffs. *See generally, Rhem v. Malcolm*, 527 F.2d 1041 (2d Cir. 1975).

■ Plaintiffs also allege that their due process rights are infringed due to the fact that they are placed in seclusion (locked in their rooms) at various times, and in particular, for approximately two hours per day, while the staff of the institution eats their meals. Obviously, it would be preferable if the Chester facility had sufficient staff members to avoid the need for this sort of action. Nonetheless, it is equally apparent that defendants' purpose in secluding patients during staff meal periods is not punitive in nature. Faced with staffing limitations and the overriding need to maintain internal security, defendants have made a particular administrative decision for purposes of preserving order during staff meal periods. "The court might disagree with the choice of means to effectuate those interests, but it should not 'second-guess the expert administrators on matters on which they are better informed....'" *Bell v. Wolfish, supra,* 441 U.S. at 544, 99 S.Ct. at 1877. Because the Court finds that plaintiffs' meal time seclusion is not intended as punishment, defendants' motion for summary judgment on this issue must be granted.

■ Patients also challenge the policy at Chester that prohibits them from receiving unescorted grounds passes and off-grounds passes.[9] Plaintiffs assert that the restriction on passes at Chester violates their due process and equal protection rights. Again applying the standards established in *Bell v. Wolfish*, the Court finds the pass proscription to be reasonably related to defendants' hybrid interest in security and treatment. Officials at Chester have decided that security and treatment concerns mandate the prohibition of certain passes. Absent any showing that this decision was intended as punishment, the Court will not interpose its judgment with that of the administrators and clinicians. Accordingly, defendants' motion for summary judgment on the issue of grounds passes must be granted.

Plaintiffs next assert that they have been denied a constitutional right of access to the courts because (1) the location of the Chester facility makes it practically impossible to meet with their attorneys, (2) limitations on telephone use at Chester make it practically impossible to communicate with their attorneys, and (3) there is no law library at

---

**9.** Upon determination that a patient no longer requires a security setting, the patient is to be transferred to an unsecured facility near his residence. At that unsecured facility, the patient will be entitled to unescorted grounds passes and off-grounds privileges if it is decided that he is ready for such privileges.

the facility. The following material facts with respect to this claim are uncontroverted. All plaintiffs are represented by counsel as a result of the criminal charges pending against them. Although 70 percent of the USTs are from Cook County, Illinois, the Chester facility is located approximately 370 miles from Cook County. The telephone policy at Chester allows patients to make outgoing calls, but not to receive incoming calls. They can make the outgoing calls only at specified times two times per week for ten minutes. The facilities at Chester do not allow for privacy when engaging in telephone conversations. Thus, treating plaintiffs' access claims as a unified whole, the gist of the argument is that given the location of the Chester facility, the restrictions on telephonic communication and the lack of a law library, plaintiffs effectively have been cut off from meaningful access to their counsel and the courts.

It is important to note that plaintiffs do not assert the need for access to the courts and counsel for purposes of attacking the conditions of their confinement or for filing writs of habeas corpus. Rather, plaintiffs' needs are far more immediate. Illinois law requires that the court set a hearing every 90 days to determine if the UST is fit to stand trial; and if not, whether the UST is making progress. Ill.Rev.Stat., ch. 38, § 104–20. If found fit, the UST may soon find himself facing trial on the pending criminal charges. If the court finds the UST unfit but making progress, it may modify the treatment plan. If the court finds that there is no substantial probability of the UST attaining fitness within one year, a discharge hearing must be ordered. Clearly, these proceedings have a significant impact on plaintiffs' status, and plaintiffs' rights would severely be effected if meaningful access to the Court was impeded.

It is well established that prisoners have a constitutional right of meaningful access to the courts.[10] *Bounds v. Smith*, 430 U.S. 817, 819, 821–22, 97 S.Ct. 1491, 1493, 1494–95, 52 L.Ed.2d 72 (1977). Although each of the three concerns identified by plaintiffs might not require judicial action standing alone, when taken in combination, it is apparent that the patients at the Chester facility have been effectively cut off from access to their counsel and the courts. Distance and telephone restrictions serve to severely limit communications between plaintiffs and their attorneys, and the lack of a law library makes self help impossible.

In *Bounds*, the Court recognized that there are a variety of ways in which meaningful access to the courts may be accomplished, including, but not limited to the creation of a law library. In the instant case, meaningful access to the courts can be achieved without resorting to the costly alternative of providing a law library. *See United States v. Chatman*, 584 F.2d 1358 (4th Cir. 1978). Since the plaintiffs all have attorneys, access to the courts can be assured if plaintiffs are given greater access to their attorneys. Although there is little that can be done to change the distance between the plaintiffs and their attorneys, a more open policy regarding plaintiffs' ability to communicate with their attorneys on the telephone would serve to give plaintiffs meaningful access to their counsel, and thereby to the courts.

In summary, the Court finds that the assignment of plaintiffs to the Chester facility and the transfer of plaintiffs from less restrictive facilities to Chester violated procedural due process. In order to remedy this violation, the Court has set out procedures to protect the interests of USTs before being confined at Chester. The Court rejects plaintiffs' sex discrimination claim because plaintiffs have failed to show that defendants acted with invidious discriminatory intent in placing male USTs at Chester and female USTs at the Elgin facility. The

10. Defendants' argument that convicted prisoners somehow have greater rights of access to the courts than the patients at Chester who have been accused, but not convicted of crimes,

was addressed in this Court's earlier opinion. *Johnson v. Brelje*, 482 F.Supp. 125, 132 (N.D.Ill. 1979).

Court also rejects plaintiffs' substantive due process claims regarding conditions at Chester, with the exception of plaintiffs' contentions as to the lack of adequate outdoor activities. Plaintiffs did show that their access to the courts and counsel have been seriously limited, and the Court suggested a method for defendants to provide meaningful access without significant disruption to the existing procedures at Chester. Finally, the Court finds that plaintiffs' equal protection claim regarding periodic reviews of patients' needs is not in a posture at this time for resolution on motions for summary judgment.

With the exception of setting forth notice and hearing procedures to cure procedural due process violations, the Court has chosen not to impose specific remedies for the constitutional violations detailed in this opinion.[11] Rather than impose specific remedies at this stage, the Court believes that the parties, who have intimate knowledge of the procedures and conditions at Chester, should be provided with an opportunity to fashion mutually agreeable remedies for the detailed violations, within the guidelines provided by this opinion. The parties are to meet forthwith and draft a supplemental order which will set forth practicable procedures to implement the rulings set forth in this opinion. The parties are to present the supplemental order in open court on September 18, 1981, at 10:30 a. m.[12] Agreement as to the form of this supplemental order shall not be deemed by defendants as agreement with the instant underlying opinion should defendants seek review thereof. It is so ordered.

---

11. Plaintiffs also seek damages from the defendants. It is evident that plaintiffs' allegations against defendants Brelje and DeVito attack defendants' actions only in their official capacity. Therefore, as an action against the State of Illinois, plaintiffs' damage request is outside the jurisdiction of this Court. *Shashoua v. Quern*, 612 F.2d 282, 284 (7th Cir. 1979). Moreover, even under the standard used by plaintiffs, the record fails to indicate that defendants acted with malicious intent or with deliberate indifference to plaintiffs' rights, or that defendants knew or should have known

that some of their actions violated plaintiffs' constitutional rights. Thus, no monetary damages may be awarded against the defendants.

12. If at all possible, this proposed supplemental order should set forth an agreed resolution of the remaining unresolved non-remedial issue: plaintiffs' equal protection claim regarding periodic reviews of patients' needs. If the parties cannot so agree, they are to file supplemental briefs consistent with the directions in this opinion at the September 18, 1981, status call.