SIXTH DIVISION

May 24, 2002 

Nos. 1-99-4248, 1-00-2108 (consolidated) 

C.J., K.M., and THOMAS JURESIC,

Plaintiffs-Appellees,

v.

THE DEPARTMENT OF HUMAN SERVICES,

Defendant-Appellant.

)))))))))

)

Appeal from the

Circuit Court of

Cook County

Honorable

James F. Henry,

Judge Presiding.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiffs C.J., K.M., and Thomas Juresic filed this class action lawsuit seeking injunctive relief against defendant, the Illinois Department of Human Services (Department).  Plaintiffs are criminal defendants found not guilty by reason of insanity (NGRIs) who were involuntarily committed to the Elgin Mental Health Center (Elgin).  Plaintiffs filed suit challenging the Department's  policy that did not allow any NGRI patient at Elgin to be considered or recommended by Elgin staff  for an unsupervised on-grounds pass. 
 Plaintiffs contend that the Department policy deprived plaintiffs of their liberty interest in freedom of bodily movement without the exercise of professional judgment in violation of the due process clause of the 
fourteenth 
amendment of the United States Constitution (U.S. Const., amend. XIV).

The trial court initially granted the Department's motion under section 2-619 of the Code

of Civil Procedure (735 ILCS 5/2-619 (West 1998)) to dismiss plaintiffs' complaint.  On appeal this court affirmed dismissal of plaintiffs' Illinois statutory claims in counts I, II, III, IV and V.  
C.J. v. Department of Mental Health & Developmental Disabilities
, 296 Ill. App. 3d 17, 23-27 (1998).   However, we reversed and remanded plaintiffs' constitutional claims.  We found, as to counts VI, VII, and VIII, that plaintiffs "adequately pled a constitutionally protected liberty interest in freedom of bodily movement, challenging the Department's alleged policy preventing the facility director of Elgin from considering unsupervised on-grounds passes for the plaintiffs." 
 C.J. v. Department of Mental Health & Developmental Disabilities
, 296 Ill. App. 3d 17, 29 (1998).  
In the counts that survived the motion to dismiss, the plaintiffs alleged that the Department's policy restricting grounds passes violated due process because it was not based on professional judgment (count VI); it restricted plaintiffs' liberty interest in freedom of bodily movement (count VII); and it was unrelated to a reasonable expectation that any NGRI patient will inflict physical harm to others if considered for a grounds pass (count VIII).  

On remand, we indicated that various questions of fact needed to be addressed by the trial court before it determined whether the Department violated due process by depriving plaintiffs of their liberty interest in freedom of bodily movement without the exercise of professional judgment.  Based on plaintiffs' surviving allegations, we asked the trial court to resolve the factual issues raised by the pleadings by addressing what constitutes an unsupervised on-grounds pass, the nature of  the plaintiffs' liberty interest in freedom of movement, plaintiffs' conditions of confinement, whether the Department adopted a policy prohibiting the exercise of professional judgment regarding considering and recommending passes, and the Department's justification in terms of due process for restricting the plaintiffs' liberty.
  
C.J.
, 296 Ill. App. 3d at 31-32. 

The trial court on remand conducted a hearing during which it considered testimony including oral and written submissions from the parties.  Plaintiffs called Department employees Dr. Dinwiddie, medical director at Elgin
, Dennis Headley, forensic program administrator at Elgin, and Michael Howie, the forensic network manager for the Department,
 as adverse witnesses.  Lorenzo Turner, a former NGRI patient who was discharged from Elgin in 1997, testified for the plaintiffs. 

After considering the evidence and addressing the factual issues we previously identified, the court 
granted class action relief in favor of the plaintiffs and ordered its injunction to apply to all similarly situated current or future NGRI patients at Elgin.  On November 8, 1999, the trial court entered a written order consistent with its oral findings granting plaintiffs relief from the pass policy directed at all NGRI patients at Elgin, which restricted their freedom of movement without the exercise of professional judgment.  The trial court, applying the principles articulated in 
Youngberg v. Romeo
, 457 U.S. 307, 73 L. Ed. 2d 28
, 102 S. Ct. 2452 (1982), found the Department deprived plaintiffs of their liberty interest in freedom of bodily movement without the exercise of professional judgment and found that this deprivation of liberty violated the due process clause of the fourteenth 
amendment.  The trial court found that no legitimate interest of the Department would be harmed by the injunction and that plaintiffs would suffer irreparable harm if a permanent injunction were not issued.
  The court in granting plaintiffs injunctive relief regarding the on-grounds passes ordered that the Department exercise "individualized professional judgment in considering, reviewing, recommending  and approving such passes."  Plaintiffs' motion for costs and fees pursuant to 42 U.S.C. §1988 (1994) was granted.

The facts have been outlined in our previous opinion, 
C.J.
, 296 Ill. App. 3d 17, and will only be repeated here as necessary in resolving the issues raised by this appeal.  The Department argues that the trial court erred in granting an injunction because the lawsuit was barred by the doctrine of sovereign immunity, the Department did exercise professional judgment, and the trial court erred in awarding fees to plaintiffs' counsel.  We affirm.

I. SOVEREIGN IMMUNITY

The Department claims that under the doctrine of sovereign immunity the trial court lacked subject-matter jurisdiction to issue an injunction.  Although the Department did not raise this defense in the trial court, it did not waive appellate review because a party cannot waive the issue of subject-matter jurisdiction.  
Currie v. Lao
, 148 Ill. 2d 151, 157 (1992).  Article XIII, 

section 4, of the Illinois Constitution abolished sovereign immunity but, gave the General

Assembly the power to provide for immunity by law. Ill. Const. 1970, art. XIII, §4.  Thereafter, 

the General Assembly enacted the State Lawsuit Immunity Act (745 ILCS 5/1 (West 1998)).  

This Act reasserted the doctrine of sovereign immunity in favor of the State except where the

State has expressly consented to be sued or where the suit is brought pursuant to the Court of 

Claims Act (705 ILCS 505/1 
et seq. 
(West 1998)) or the Illinois Public Labor Relations Act (5 

ILCS 315/1 
et seq.
 (West 1998)).  
745 ILCS 5/1 (West 1998).  

  

The Illinois Supreme Court has determined that the doctrine of sovereign immunity does not apply to actions against the State where plaintiff "seeks to enjoin the defendant from taking actions in excess of his delegated authority and in violation of plaintiff's protectible legal interests."  
Bio-Medical Laboratories, Inc. v. Trainor
, 68 Ill. 2d 540, 548 (1977).  In 
Rockford Memorial Hospital v. Department of Human Rights
, 272 Ill. App. 3d 751, 755 (1995), the court labeled this exception to the doctrine of sovereign immunity as the "prospective injunctive relief exception" and stated that it applies "where a plaintiff seeks to enjoin a State agency or official from taking actions in excess of his statutory or constitutional authority."  
Rockford Memorial Hospital
, 272 Ill. App. 3d at 755.  In 
Landfill, Inc. v. Pollution Control Board
, 74 Ill. 2d 541, 552 (1978), the Illinois Supreme Court found that the doctrine of sovereign immunity did not bar an action in the circuit court seeking a declaration that a state agency was acting beyond its delegated authority.  
Landfill, Inc
, 74 Ill. 2d at 552.  

Here, plaintiffs sought injunctive relief to prevent the Department and its officials from violating their due process
 rights.  Plaintiffs asserted that the Department, through Elgin staff officials, acted in excess of their constitutional authority.  Plaintiffs asked the circuit court to enter an injunction requiring Elgin staff officials to comply with plaintiffs' due process rights. 

The Department, however, counters that plaintiffs did not sue a specific state official but a state agency.  The Department correctly points out that the doctrine of sovereign immunity applies to lawsuits against agencies of the State, which are considered arms of the State, because these lawsuits could deplete state funds and interfere with governmental functions.  
Ellis v. Board of Governors of State Colleges & Universities
, 102 Ill. 2d 387, 393-94 (1984); 
People ex rel. Manning v. Nickerson
, 184 Ill. 2d 245, 248 (1998).
  However, this court has explained that sovereign immunity exists only if (1) the defendant is an arm of the State; (2) plaintiff's action constitutes a "present claim" which could subject the State to liability; and (3) no exception to the doctrine exists.  
City of Chicago v. Board of Trustees of the University of Illinois
, 293 Ill. App. 3d 897, 900 (1997).  In
 City of Chicago
, the court held that the doctrine of sovereign immunity did not bar plaintiff's action, even though it
 
sued an arm of the State, because the lawsuit constituted a declaratory action and not a present claim. 
 City of Chicago
, 293 Ill. App. 3d at 902.

Moreover, "[t]he determination of whether an action is in fact a suit against the State turns upon an analysis of the issues involved and the relief sought, rather than the formal designation of the parties."  
Currie v. Lao
, 148 Ill. 2d at 158.  In making this determination, the court in 
Rockford Memorial Hospital
 examined the substance of plaintiff's action against the Department of Human Rights rather than simply the party plaintiff sued. 
 Rockford Memorial Hospital
, 272 Ill. App. 3d at 757.  Reviewing the issues presented and the relief sought, the court concluded that even though plaintiff sued an arm of the State, the action sought to prevent a state official from acting outside his authority and therefore was not barred by sovereign immunity.  
Rockford Memorial Hospital
, 272 Ill. App. 3d at 757.

In this case, an examination of the evidence presented to the trial court and the relief that the court ordered reveals that plaintiff did not seek to enforce a present claim but sought injunctive relief to require the Department's Elgin staff to comply with the due process clause of the fourteenth
 amendment by exercising professional judgment in considering and recommending unsupervised on-grounds passes for NGRI patients.  Plaintiffs also did not seek money damages against the Department.  Although plaintiffs sued an arm of the state, their action sought prospective relief against the illegal actions of state officials.  Similar to the plaintiff in 
Rockford Memorial Hospital
, here plaintiffs' action sought to prevent state officials from acting outside their authority.  Pursuant to 
Rockford Memorial Hospital
,
 Bio-Medical Laboratories, Inc.
,
 
and 
Landfill, Inc.
, we find that the doctrine of sovereign immunity did not bar plaintiffs' lawsuit, and the circuit court had jurisdiction to grant the injunctive relief plaintiffs sought.     

The Department further argues that the circuit court did not have jurisdiction to hear plaintiffs' constitutional claims under 42 U.S.C. §1983 (1994).  In creating a section 1983 cause of action for constitutional and civil rights violations, Congress did not intend to permit plaintiffs to bring lawsuits against states in state court.  
Will v. Michigan Department of State Police
, 491 U.S. 58, 66, 105 L. Ed. 2d 45, 55, 109 S. Ct. 2304, 2309 (1989).  In 
Will
, the Supreme Court held that a state is not a "person" and is not subject to a section 1983 lawsuit. 
 Will
, 491 U.S. at 65-66, 105 L. Ed. 2d at 54, 109 S. Ct. at 2309.  However, the Supreme Court clarified that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under [section] 1983 because 'official-capacity actions for
 prospective relief are not treated as actions against the State.'  [Citation.]"  
Will
, 491 U.S. at 71 n.10, 105 L. Ed. 2d at 58 n.10, 109 S. Ct at 2312 n.10.

Plaintiffs' complaint alleged that the Department, through its officials, was violating plaintiffs' due process rights.  The trial court's order of injunction defines "Department" to include the Department's employees and specifically requires the "employees of the Department" to exercise professional judgment in considering and recommending unsupervised on-grounds passes.  While a state is not a "person" subject to a section 1983 lawsuit, a state employee in his or her official capacity, when sued for injunctive relief, is a person under section 1983 because "official capacity" actions for prospective relief are not considered to be actions against the State.  
Will
, 491 U.S. at 71 n. 10, 105 L. Ed. 2d at 58 n. 10, 109 S. Ct. at 2312 n. 10.  Here, because plaintiff brought an "official capacity" action for prospective relief, the cause of action is not treated as an action against the State.  Plaintiff requested and received prospective injunctive relief against state employees acting in their official capacity.  Therefore, we conclude the circuit court had jurisdiction to grant this relief pursuant to section 1983.   

             II. INJUNCTIVE RELIEF

We now turn to the issue of the court's injunction and first address the appropriate standard of review.  
 
Plaintiffs contend that an abuse of discretion or manifest weight of the evidence standard should apply because the parties do not dispute the law but challenge the trial court's factual findings and application of the law to the facts.  The standard of review for preliminary injunction is abuse of discretion.  
Dixon Ass'n for Retarded Citizens v. Thompson
, 91 Ill. 2d 518, 524-25 (1982).  A trial court abuses discretion by acting arbitrarily without conscientious judgment, exceeding the bounds of reason, or ignoring recognized principles of law, so that substantial prejudice results. 
Kaden v. Pucinski
, 263 Ill. App. 3d 611, 615 (1994).  
The standard of review for a permanent injunction is manifest weight of the evidence.  
Harper v. Missouri Pacific R.R. Co.
, 282 Ill. App. 3d 19, 24-25 (1996).  "A trial court's judgment is against the manifest weight of the evidence only if the opposite result is clearly evident."  
Harper
, 282 Ill. App. 3d at 25. 

Relying on 
Butler v. USA Volleyball
, 285 Ill. App. 3d 578 (1996), the Department argues that we should apply a 
de novo
 standard of review because the issue of whether the Department violated plaintiffs' due process rights raises a question of law.  In 
Butler
, the issue on appeal was whether the bylaws of the USA Volleyball Association contained sufficient standards to inform the coach that he could be expelled for conduct which violated the purpose of the Association.  
Butler
, 285 Ill. App. 3d at 581-82.  We note that, unlike the instant case, resolution of the 
Butler
 case required  interpretation of the Association's bylaws, which 
involved purely questions of law subject to 
de novo
 review.  We do not find the 
Butler
 case instructive.

To determine the appropriate standard of review in this case, we examine whether the trial court's order granting permanent injunctive relief arose from its resolution of questions of law or questions of fact.  We believe that our previous decision in 
C.J.
 sheds light on this issue
, wherein we ordered the circuit court to resolve several issues of material fact that the pleadings raised, including, but not limited to, the following: "(1) what in fact constitutes an unsupervised on-grounds pass and whether this pass violates the plaintiffs' liberty interest in freedom of movement; (2) whether in fact plaintiffs are confined indoors and whether the conditions of confinement since May 30, 1990, constitute a 'lock down' at the Elgin Mental Health Center; (3) whether in fact the Department has adopted policies or practices that prohibit Elgin staff members from exercising their individualized professional judgment in considering and recommending an NGRI acquittee for unsupervised on-grounds passes; (4) whether in fact professional judgment is being exercised in making individual recommendations regarding unsupervised on-grounds passes; and (5) whether defendants have lawful justification consistent with due process for alleged restrictions on plaintiffs' movement based on legitimate state interests in treatment and security." 
 C.J.
, 296 Ill. App. 3d at
 31-32.  

We noted that the trial court after resolving the above questions of fact would then have to apply the law to the facts to determine whether the Department deprived plaintiffs of their liberty interest and whether such deprivation violated due process.
  The trial court considered evidence on the factual issues we identified and in granting the injunction resolved various factual issues in favor of the plaintiffs.  We will not reverse this decision unless it is against the manifest weight of the evidence.   

The Supreme Court has recognized that the State's confinement of an individual for any purpose significantly infringes on that individual's liberty and requires due process protection.  
Foucha v. Louisiana
, 504 U.S. 71, 80, 118 L. Ed. 2d 437, 448, 112 S. Ct. 1780, 1785 (1992).
  Previously, in 
C.J.
, we found 
Youngberg v. Romeo
, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 

(1982), instructive in helping us determine if plaintiff sufficiently alleged a due process violation.  

C.J.
, 296 Ill. App. 3d at 28.  Applying the 
Youngberg
 principles, in 
C.J.
, we held that "plaintiffs have 

adequately pled a constitutionally protected liberty interest in freedom of bodily movement, 

challenging the Department's alleged policy preventing the facility director of Elgin from considering 

unsupervised on-grounds passes for the plaintiffs."  
C.J.
, 296 Ill. App. 3d at 29.  However, we 

recognized that on remand plaintiffs were required not only to prove that a liberty interest exists and 

has been restricted, but that the restriction violates due process.  Regarding the complexity of the 

competing interests at issue we noted:

"In operating an institution such as Elgin, it is necessary for the State

to restrain the movement of residents to protect them, as well as

others, from violence.  The issue is not simply whether a substantive

liberty interest exists and has been limited, but whether the extent,

nature and duration of the limitation is such as to violate due process."

C.J.
, 296 Ill. App. 3d at 31.

We noted that the Illinois Supreme Court in 
People v. Roush
, 101 Ill. 2d 355 (1984), expressed concerns about court interference in the administration of a state institution.  However, we found, "In the present case, in contrast to 
Roush
, the NGRI acquittees at Elgin seek to compel the Department to exercise professional judgment when giving individual consideration regarding whether to recommend an NGRI acquittee for unsupervised on-grounds passes. Exercise of professional judgment is required for recommendations that limit plaintiffs' liberty interest."  
C.J.
, 296 Ill. App. 3d at 34.  We emphasized that the criminal court judges would continue to review and either approve, modify, or deny these recommendations.  
C.J.
, 296 Ill. App. 3d at 34.  On remand, to resolve whether  due process was violated we indicated that "[i]t is for the trial court to apply the 
Youngberg
 test and determine whether professional judgment was exercised prior to the alleged liberty deprivation when balancing the NGRI acquittees' liberty interest against the Department's interest in restraining liberty." 
C.J.
, 296 Ill. App. 3d at 32.  
Youngberg
 provides the framework by which the trial court on remand determined whether plaintiffs proved a due process violation which warranted injunctive relief. 

Youngberg
 addressed whether someone who is involuntarily committed to a state mental institution has substantive due process rights to safe conditions of confinement, freedom from bodily restraint, and training or habilitation.  
Youngberg
, 457 U.S. at 320, 73 L. Ed. 2d at 40, 102 S. Ct. at 2460.  
In 
Youngberg
, the Court recognized that persons involuntarily committed to state institutions 
have certain liberty interests; however, the liberty interest for confined individuals is not absolute because the State has a competing interest in restricting the movement of these individuals in its institutions. 
 Youngberg
, 457 U.S. at 320, 73 L. Ed. 2d at 40, 102 S. Ct. at 2460.  Therefore, to determine if the State's restriction of bodily movement rises to the level of a due process violation, one must balance the individual's liberty interest with the State's asserted reasons for restricting this liberty interest.  
Youngberg
, 457 U.S. at 320, 73 L. Ed. 2d at 40, 102 S. Ct. at 2460. 
 The Supreme Court found the appropriate standard for balancing the individual's liberty interests against the State's asserted reasons for restraining individual liberty is whether the State exercised professional judgment in restricting the liberty interest.  
Youngberg
, 457 U.S. at 324, 73 L. Ed. 2d at 42, 102 S. Ct. at 2462.  
Youngberg
 requires that when a decision to restrict liberty is made, it must be shown that professional judgment was used to balance the plaintiffs' liberty interest against the State's interest in restraining liberty.  
Youngberg
, 457 U.S. at 321, 73 L. Ed. 2d at 40
, 102 S. Ct. at 2461. 
  

The Court in 
Youngberg
 recognized that involuntarily committed mental patients have a 

liberty interest in personal security, freedom from bodily restraint, and minimally adequate training 

to ensure safety and freedom from undue restraint.  
Youngberg
, 457 U.S. at 316-19, 73 L. Ed. 2d at 

37-39, 102 S. Ct. at 2458-60.  The 
Youngberg 
Court weighed those postcommitment interests

cognizable as liberty interests under the due process clause of the 
fourteenth amendment against 

legitimate state interests, taking into consideration the constraints under which most state institutions 

necessarily operate, and found
:

"Respondent thus enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.  Such conditions of confinement would comport fully with the purpose of respondent's commitment.  [Citation.]  In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness."  
Youngberg
, 457 U.S. at 324, 73 L. Ed. 2d at 42
-43, 102 S. Ct. at 2462.

Youngberg
 recognized that decisions to restrict liberty if made by a professional are presumptively

valid.  Regarding liability for violating due process by professional decisions restricting liberty, 

Youngberg
 concluded: 

"[L]iability may be imposed only when the decision by the

professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  
Youngberg
, 457 U.S. at 323, 73 L. Ed. 2d at 42
, 102 S. Ct. at 2462.

Based on those principles, the 
Youngberg 
Court found the jury was erroneously instructed on the  standard of liability for violating due process and remanded for further proceedings.
 

Under the two-part test articulated in 
Youngberg, 
plaintiffs in this case must demonstrate, first, that their liberty interest in freedom of movement was restricted by the Department.  Under the second prong of the 
Youngberg
 test, when a decision to restrict liberty is made, it must be shown that professional judgment was used to balance the plaintiffs’ liberty interest against the State’s interest in restricting liberty.  
Youngberg
, 457 U.S. at 321, 73 L. Ed. 2d at 40
, 102 S. Ct. at 2461.  Therefore, in order to establish a violation of due process plaintiffs must show that the liberty restriction by the Department was based on a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  
Youngberg
, 457 U.S. at 323, 73 L. Ed. 2d at 42
, 102 S. Ct. at 2462.  We separately address each requirement under the 
Youngberg 
test.  We first determine whether the trial court's finding that the Department restricted plaintiffs' liberty interest in freedom of movement was against the manifest weight of the evidence.

A. LIBERTY INTEREST IN FREEDOM OF MOVEMENT RESTRICTED

The record reflects that the Department terminated the on-grounds passes of all NGRI patients on May 30, 1990.  The evidence revealed that at the time of the hearing conducted by the trial court approximately 150 NGRI patients resided at Elgin.  Before 1990, Elgin staff members, when clinically appropriate, recommended NGRI patients for court-approved, unsupervised on-grounds passes.  After a three-step process, an NGRI patient could be eligible for an unsupervised on-grounds pass.  This process included a clinical review by Elgin staff members, an administrative review by the forensic program administrator and the Elgin facility director, and a judicial determination by the criminal court judge.  The clinical and administrative reviews served as a recommendation for the criminal court judge who would make the final decision on whether to approve an unsupervised on-grounds pass.  If an NGRI patient posed a risk of escape, the patient would not be recommended for an unsupervised on-grounds pass. 

The trial court found that in 1990, the Elgin staff stopped recommending unsupervised on-grounds passes.  The Department admits that in 1990 it changed its on-grounds pass policy and reconfigured the grounds at Elgin.  Following the escape of two NGRI patients and media coverage about the escapes, the Department implemented a general blanket policy that eliminated unsupervised on-grounds passes for all NGRI patients at Elgin.  Specifically, the Department added a 15-foot secure fence around the forensic area and restricted on-grounds passes to travel between the buildings within the forensic area. 
 Under that policy NGRI patients would travel between buildings by using enclosed corridors connecting the forensic buildings.

The record reflects that NGRI patients vary in diagnoses, symptoms, dangerousness, length of stay and proximity to discharge.  All three employees of the Department who testified, Dr. Dinwiddie, medical director at Elgin, Michael Howie, forensic network manager, and Dennis Headley, forensic program administrator, agreed that the Department's current practice was to deny unsupervised on-grounds passes to all NGRI patients.  Elgin forensic program administrator Dennis Headley testified that every one of the NGRI patients who had a grounds pass in 1990 lost that pass, and under the new policy, not a single NGRI patient was permitted to have the grounds pass that he used to have.

After hearing the evidence, the trial court found the Elgin staff stopped recommending

unsupervised on-grounds passes.  The trial court found that while no "lock down" exists at Elgin, 

the record demonstrated that the Department policy restricted the plaintiffs' liberty interest in freedom 

of movement.  Regarding the change in policy the trial court noted:

"It appears from the record that it was as the result of several unauthorized absences.  The evidence of that was not strong, and one of the attempts to allude to it by way of the fact that it had been reported in the press I sustained an objection, but it is clear that the policy did change somewhere along the way.  Current administration was not able to pinpoint a reason for it, but it's certainly clear to this court that there are no longer any unsupervised on-grounds passes except for a very limited number of people who are living in the white – what is referred to as the white cottage there."

We note the white cottage provides housing for patients who have been determined by the Department not to be an escape risk or a danger to themselves or others.

Based on the record it was not against the manifest weight of the evidence for the trial court to conclude that since 1990 plaintiffs’ liberty interest in freedom of movement was restricted.  However, that is the first prong of the 
Youngberg
 test and the preliminary issue in the case.  To determine whether such restriction violated due process, plaintiffs must satisfy the second prong of the 
Youngberg
 test and demonstrate the liberty restriction was based on a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  
Youngberg
, 457 U.S. at 323, 73 L. Ed. 2d at 42
, 102 S. Ct. at 2462.  We next address whether the second prong of the 
Youngberg
 test has been satisfied.  Specifically, we determine whether it was against the manifest weight of the evidence for the trial court to conclude that the Department violated plaintiffs' due process rights by failing to exercise professional judgment in restricting plaintiffs' liberty interest in freedom of movement. 

B. FAILURE TO EXERCISE  PROFESSIONAL JUDGMENT VIOLATED DUE PROCESS

To determine whether the Department's restriction of the plaintiffs' liberty interest in  freedom of movement violated due process, the trial court was required to consider whether, in making the decision to restrict plaintiffs' liberty, the Department exercised professional judgment.  As recognized in 
Youngberg
, the appropriate standard for balancing the individual liberty interest with the State's reasons for restricting this liberty interest is whether the State exercised professional judgment in restricting the liberty interest.  
Youngberg
, 457 U.S. at 324, 73 L. Ed. 2d at 42
, 102 S. Ct. at 2461-62.  Applying that standard, the trial court considered whether the Department adopted a policy that prohibited Elgin officials from exercising individualized professional judgment regarding whether an NGRI patient should be recommended for an unsupervised on-grounds pass.

Plaintiffs claim the Department failed to exercise professional judgment in restricting plaintiffs'

liberty interest in freedom of movement.  The Department argues it exercised professional judgment. 

In 
Lucas v. Peters
, 318 Ill. App. 3d 1, 14 (2000), this court discussed the 
Youngberg
 professional

judgment standard.  
Lucas
, rejecting the argument that professional judgment referred to any decision

made by a professional, stated:

" 'Professional' judgment can be argued to mean a decision any decision, however outrageous it might be, so long as it has been made by a professional.  A careful reading of 
Youngberg
, however, explodes this interpretation.  
Youngberg
 uses 'professional judgment' not to mean a decision made by a professional but rather as synonymous with accepted standards and practices within the relevant profession." 
 Lucas
, 318 Ill. App. 3d at 14. 

Here, the Department implemented a blanket policy to restrict the bodily movement of NGRI patients by no longer recommending any NGRI patient for an unsupervised on-grounds pass.  Although testimony before the trial court indicated therapeutic and clinical reasons for allowing unsupervised on-grounds passes,  the Department believed that general safety concerns required it to restrict movement of all NGRI patients to the fenced corridors between buildings.  While the Department identified a policy change to restrict movement of all NGRI patients at Elgin, the Department did not explain how its officials exercised professional judgment in making that policy decision.
  The Department's policy restricted all NGRI patients to movement within the secured fence and enclosed corridors connecting the forensic buildings.  The Department’s own forensic program administrator, Dennis Headley, testified that he did not even know who implemented the policy to restrict the movement of all NGRI patients.

Michael Howie, forensic network manager, testified that the passes were changed in 1990 after two escapes and media coverage of these escapes in the Chicago area.  However, no evidence was offered demonstrating that plaintiffs escaped, presented any security concerns, presented any escape risk or were a danger to themselves or to the community.  No evidence was presented that connected the causes of the two escapes in 1990 to the plaintiffs in this case.  Not a single NGRI patient is allowed to have the type of pass that many NGRI patients had in 1990. No evidence was presented to suggest a clinical basis for this change in policy.  Dr. Dinwiddie, medical director at Elgin since 1996, provided no reason for taking away the passes.  He conceded that there was no research that suggested that allowing plaintiffs to have such passes harmed them in any manner or interfered with their treatment.  

Additional evidence that the Department's pass policy is not based upon the exercise of professional judgment was provided by Dinwiddie, Howie and Headley.  They testified that the Department gives virtually an identical amount of liberty to NGRI patients who have not been approved by a court for a pass as they give to patients who have such passes.  Further evidence that the Department's pass policy is not based upon the exercise of professional judgment is the fact that NGRI patients with unsupervised off-grounds passes and home visits upon returning to the Elgin facility are not allowed to be considered for unsupervised on-grounds passes.  No testimony was offered by the Department explaining this inconsistent policy.

Michael Howie and Dennis Headley described the various reasons for the pass system.  Granting progressive liberties serves a treatment purpose by allowing the treatment team to follow a patient’s progress in gradually becoming accustomed to responsibilities and liberties in preparation for discharge.  Responsible use of the pass by the NGRI patient demonstrates to the judge who makes the final determination regarding additional liberties and eventual discharge that the patient is, in fact, ready for the next level of liberty.  Headley testified as to three purposes served by unsupervised on-grounds passes, including: (1) to enhance treatment; (2) to improve the patient’s progress; and (3) to allow the patient to assume greater responsibility for decision making.  He acknowledged that the NGRI patient’s proper use of unsupervised on-grounds passes demonstrates that the patient is prepared for living in the real world, not likely to escape, and committed to treatment.  Despite the therapeutic purpose of these passes, the record reflects a blanket policy which denied the possibility of receiving unsupervised on-grounds passes to the entire NGRI population, restricting their liberty interest in freedom of movement, without regard to their clinical status or present dangerousness.

After hearing the evidence, the trial court properly applied the balancing test articulated in 
Youngberg
 and determined whether the Department’s pass policy violated the NGRI patients' constitutionally protected liberty interest in freedom of bodily movement.  The trial court recognized that these interests are not absolute.  The trial court conducted an extensive factual hearing to determine whether professional judgment was used to balance the restraint of plaintiffs’ liberty with the interests of the institution.  The trial court demonstrated sensitivity to the fact that in operating an institution such as Elgin, it is necessary for the State to restrain movement of residents to protect them, as well as others, including the community, from violence.  The trial court was mindful that “The issue is not simply whether a substantive liberty interest exists and has been limited, but whether the extent, nature and duration of the limitation is such as to violate due process.”  
C.J.
, 296 Ill. App. 3d at 31.

Keeping this principle in mind, the court undertook to determine whether the nature, extent, and duration of the restriction on plaintiffs’ liberty was such to violate due process.  To determine whether this restriction rises to the level of a due process violation requiring court relief, the trial court considered whether, in making this decision, the Department exercised professional judgment.  As recognized in 
Youngberg
, the appropriate standard for balancing the individual liberty interest with the State’s reasons for restricting this liberty interest is whether the State exercised professional judgment in restricting the liberty interest.  
Youngberg
, 457 U.S. at 324, 73 L. Ed. 2d at 42
, 102 S. Ct. at 2462.

In addressing the issue of whether professional judgment was exercised, the trial court noted

"[t]he  issue in this case isn't whether the facility is locked down or whatever, but whether or not the 

professional staff is exercising independent judgment for each of the individual people who are 

confined at the facility."  We note there was no allegation and no issue that suggested the 

Department was not creating individualized treatment plans for any member of the plaintiff class.  

Individual evaluations are undertaken in the preparation of treatment reports that are presented to the 

criminal court judge every 60 days.  The issue was whether, regarding unsupervised on-grounds

passes, the Department exercised professional judgment in restricting the plaintiffs' liberty interest in

freedom of movement.  While the trial court found that the Department implemented individual 

treatment plans for NGRI patients, the court noted:

"There is no question in my mind, and this point was made a number of times by the Attorney General in his argument and the testimony from the witnesses that were here, that there is an individual plan for each of the people who have been committed to the facility by either not guilty by reason of insanity, acronym, GRI or unfit to stand trial, UST, but even, though, they have an individual plan, that individual plan does not take into consideration all the available treatment mechanisms, then each individual is not being treated as an individual.

This Court is not -- and I want to reiterate for the record -- trying to micromanage and will not micromanage the decisions that are being made by the professionals in the mental health field at the Department of Human Services and those specifically at Elgin, but it is clear that certain people that have been incarcerated there are being treated exactly the same as everybody else with apparently no consideration given to the fact that some of them may not be as dangerous, or their situation may not be as hazardous to the community as others.

And these people seem to have been put in a position where their liberty interests have been severely entailed without any corresponding benefits ***." 

The court determined that  NGRI patients were treated under the same restrictive policy regarding on-grounds passes without consideration of whether each patient posed a danger to the community.  The court specifically addressed whether the Department adopted a policy that prohibited Elgin staff members from exercising individualized professional judgment before recommending whether an NGRI patient should receive an unsupervised on-grounds pass.  The court found that sufficient evidence existed demonstrating that Elgin staff members did not exercise individualized professional judgment.  The court specifically found that the Elgin staff failed to consider whether individual NGRI patients needed to be supervised at all times, posed a flight risk, or posed a danger to themselves or the community.  Moreover, the record demonstrated that the Department failed to present an individual assessment based on professional judgment to the criminal court judge regarding recommendations for unsupervised on-grounds passes, thereby eliminating the possibility that the criminal court judge would consider or approve plaintiffs for unsupervised on-grounds passes.  Although the trial court recognized that the decision of whether an NGRI patient received an unsupervised on-grounds pass rests with the criminal court judge, the court found that Elgin staff members stopped considering NGRI patients for these passes and stopped recommending these passes, thereby preventing judges from issuing these passes. 
  

The record reflects that the nature, extent, and duration of the restraint on plaintiffs' liberty by the Department's blanket policy in failing to consider NGRI patients for unsupervised on-grounds passes violated due process.  The record reflects that the trial court’s finding that the Department did not exercise professional judgment in balancing the liberty interest of the NGRI patient with the Department's interest in restricting this liberty is not against the manifest weight of the evidence. 
 Since 1990 NGRI patients have not been recommended for unsupervised on-grounds passes regardless of the dangerousness of the individual NGRI patient and regardless of the clinical status of the NGRI patient or therapeutic value of the passes.  The evidence demonstrated that the policy regarding on-grounds passes restricting the liberty interest in freedom of movement of NGRI patients was not based on professional judgment, accepted practice or standards, clinical needs of the patient, or safety concerns.  

The trial court concluded that the "unilateral" restriction of movement "for all of the residents of the various facilities of Elgin indicates to [it] that there has been a violation of the security of their constitutional rights to be considered on an individualized basis consistent with 
Youngberg
."  Based on a thorough review of the record, we find this conclusion by the trial court was not against the manifest weight of the evidence.  Therefore, we affirm the trial court's conclusion that the Department violated due process by failing to exercise professional judgment in restricting plaintiffs liberty interest in freedom of bodily movement.

We note that the order plaintiffs sought and the order issued by the trial court does not direct the manner in which professional judgment regarding unsupervised on-grounds passes would be exercised.  Rather, plaintiffs sought an order
 compelling Elgin's director to allow the exercise of professional judgment in considering the recommendation of NGRI patients for unsupervised on-grounds passes where clinically appropriate.  We emphasize here that plaintiffs did not seek imposition of a rule requiring all NGRI patients to be given unsupervised on-grounds passes.  As we noted in our previous decision, "Instead, plaintiffs seek relief  from an alleged policy which, contravening our supreme court's decision in 
People v. Roush
, 101 Ill. 2d 355 (1984), is directed at all NGRI acquittees at Elgin, limiting their freedom of movement without exercise of professional judgment."  
C.J.
, 296 Ill. App. 3d at 31.  Defendant repeatedly characterizes plaintiffs' case and the trial court's order as being based on the premise that NGRI
 patients have a liberty interest in roaming the grounds of Elgin unsupervised.  This characterization is based on a flawed analysis.  Plaintiffs are not seeking injunctive relief requiring the Department to
 allow NGRI patients to roam or
 wander the facility grounds unsupervised.  Plaintiffs are seeking, consistent with fundamental principles of substantive due process, that the Department exercise professional judgment in restricting the plaintiffs' liberty interest in freedom of movement.  
Youngberg
, 457 U.S. at 324, 73 L. Ed. at 42,102 S. Ct. at 2462
.
 

Contrary to the Department's claim, the trial court's injunction does not require it to issue unsupervised on-grounds passes to each NGRI patient and allow NGRI patients to roam or wander the grounds of Elgin unsupervised.  Rather, the injunction requires the Department to comply with the NGRI patients' due process rights and thereby exercise professional judgment, based on accepted standards and practices, in considering whether to recommend any NGRI patient for an unsupervised on-grounds pass.  Including a recommendation where clinically appropriate for an unsupervised on-grounds pass based on professional judgment, contrary to the Department's argument would not make "running a facility such as Elgin impossible."  
The Department is currently required to evaluate the treatment of each NGRI patient every 60 days and any burden on the State from the additional consideration where clinically appropriate is nonexistent.  730 ILCS 5/5-2-4 (b) (West 1998); See 
Lucas v. Peters
, 318 Ill. App. 3d 1, 13 (2000), (individual treatment reports are required by statute every 60 days, and, therefore, any burden on the State from an additional procedure requiring individualized assessment is almost nonexistent where NGRI patients request mental health officials to make an individualized finding of what facility is most appropriate for them).  
 

We reject the Department's additional argument that requiring the exercise of professional judgment regarding considering NGRI patients for these passes when clinically appropriate would "severely limit the State's ability to make policies necessary to insure the safety and security of all residents and personnel."  At all times, safety and security concerns for the NGRI patient, the Elgin Hospital community and the general public shall be prioritized when in exercising professional judgment based on accepted standards and practices any NGRI patient is recommended for an unsupervised on-grounds pass.  The exercise of professional judgment in considering any NGRI patient for unsupervised on-grounds passes should always be made consistent with the fact that the "purpose of commitment following an insanity acquittal is to treat the individual's mental illness, and at the same time protect him and society from his potential dangerousness."  
People v. Williams
, 140 Ill. App. 3d 216, 228 (1986).  

The Department relies on 
Jeffrey v. St. Clair
, 933 F. Supp. 963 (D. Haw. 1996), as an example of state officials adopting a blanket constitutional policy without the exercise of individualized professional judgment.  In 
Jeffrey
, the state officials closed one treatment program because of asbestos and other safety concerns in the building where the patients resided.  The state officials transferred the patients to another building where they essentially received the same level of psychiatric treatment and access to clinical programs.  The patients, however, claimed a due process violation because they had less access to their dormitory rooms and more staff accompanying them on outings.  Rejecting this constitutional claim, the court found that the plaintiffs enjoyed many of the same benefits that they enjoyed in the discontinued program and therefore the state officials did not substantially depart from the professional judgment standard.  
Jeffrey
, 933 F. Supp. at 968-69.  
 Unlike the plaintiffs in 
Jeffrey
, here, the record reflects the plaintiffs did not have the same freedom of movement after the discontinued pass policy, as they had before. In the present case, unlike 
Jeffrey
, the record did not demonstrate that the Department faced a danger that affected each NGRI patient, requiring  that each NGRI patient with an unsupervised on-grounds pass be restricted to the enclosed corridors between buildings.  Moreover, the record did not demonstrate that every NGRI patient posed a danger to themselves, the community at large or to the Elgin Hospital community.  Unlike 
Jeffrey
, here, the record reflects substantial departure from the professional judgment standard required by 
Youngberg
.  

Plaintiffs do not contest that, under certain circumstances, the Department may uniformly restrict freedom of movement for NGRI patients, if, for instance, health or safety concerns require such restriction.  The injunction granted by the trial court allows for this type of restriction, if for example, conditions exist that threaten health or safety.  However, whether any NGRI patient should be entitled to an unsupervised on-grounds pass and the scope of that pass will be determined by the exercise of professional judgment as to the individual clinical needs of each NGRI patient balanced against the Department's needs for restricting the liberty of the NGRI patient, including safety concerns.  The trial court's injunction does not mandate that every NGRI patient receive an unsupervised on-grounds pass.  It requires that Department officials "exercise their individualized professional judgment in considering, recommending, reviewing, and approving such passes."  As part of this exercise of professional judgment, the trial court's injunction ordered the Department to consider whether the NGRI patient should be unsupervised and be permitted to be outside the area of the enclosed corridors between buildings.  Ultimately, the individual criminal court judge will review the Department's recommendation and approve, modify, or reject it. 

Both plaintiffs and defendant agree that in order to be entitled to permanent injunctive relief, a party "must show that he possesses a clear, protectable interest for which there is no adequate remedy at law and that irreparable injury will result if the relief is not granted."  
Sheehy v. Sheehy
, 299 Ill. App. 3d 996, 1004 (1998).  The record supports the trial court's court decision to impose an injunction because plaintiffs had no adequate remedy at law and would have suffered irreparable injury if the trial court did not grant the injunction.  A remedy at law is adequate if it is " 'clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy.' " 
 Lucas
, 318 Ill. App. 3d at 16, quoting 
Cross Wood Products, Inc. v. Suter
, 97 Ill. App. 3d 282, 286 (1981).  A plaintiff, however, does not have an adequate remedy at law and should be entitled to equitable relief where damages cannot be determined and where plaintiff has shown a continuing violation that would allow only for the recovery of nominal damages.  
Lucas
, 318 Ill. App. 3d at 16.  Here, the continuous violation of plaintiffs' due process rights demonstrates that plaintiffs do not have an adequate remedy at law. 

Plaintiffs have also shown that they sustained an irreparable injury.  As the court explained in 
Lucas
,
 
a continuing violation of a constitutional right that cannot be adequately compensated with money, coupled with an inadequate remedy at law, constitutes
  
a 
per se
 irreparable harm.  
Lucas
, 318 Ill. App. 3d at 16.  Plaintiffs have established a continuous due process violation since 1990 when the Department revoked its pass policy and  adopted a blanket policy that restricted plaintiffs' liberty interest in freedom of bodily movement without exercising professional judgment.  In the absence of professional judgment regarding eligibility for unsupervised on-grounds pass privileges the plaintiffs are being denied their due process rights under the fourteenth amendment.  The due process violation in this case is continuous in nature.  Damages cannot be measured by any monetary standard.  The only type of relief that can remedy this violation is an injunction ordering the Department to comply with plaintiffs' due process rights.  Based on the record, we find the continuing violation of plaintiffs' constitutional rights, together with an inadequate remedy at law, demonstrates irreparable harm.  The record reflects that no legitimate interest of the defendant would be harmed by this injunction and that plaintiffs would suffer irreparable harm if this permanent injunction were not issued.  The trial court's decision to grant a permanent injunction regarding on-grounds passes requiring the Department to exercise "individualized professional judgment in considering, reviewing, recommending and approving such passes" is not against the manifest weight of evidence.

III. ATTORNEY FEES

The Department argues that the trial court's award of attorney fees to plaintiffs' counsel should either be vacated or reduced.  The trial court has discretion in awarding attorney fees and  its decision will be sustained unless it abused its discretion.  
Art v. State
, 292 Ill. App. 3d 1059, 1065 (1997).  The Department first argues that the court should not have awarded fees for work performed on the counts within plaintiffs' lawsuit that the court dismissed.  See 
C.J.
, 296 Ill. App. 3d at 24-27  (affirming the dismissal of plaintiffs' Illinois statutory claims).  However, plaintiffs have prevailed in their civil rights claims.  Section 1988(b) of the Civil Rights Act provides that "the court in its discretion, may allow the prevailing party *** a reasonable attorney's fees as part of costs."  42 U.S.C. §1988(b) (1994).  A prevailing party may be entitled to all his or her attorney fees, even for unsuccessful claims, if those claims arise out of a common core of facts or legally related theories.  
Hensley v. Eckerhart
, 461 U.S. 424, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).  "[A] fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." 
 Ardt
, 292 Ill. App. 3d at 1065; 
Hensley
, 461 U.S. at 434-35, 76 L. Ed. 2d at 54-55, 103 S. Ct. at 1939-40.

In this case, the Department does not dispute that plaintiffs prevailed and further indicate in its brief that all of plaintiffs' claims "related to the issue of [on-]grounds passes and were based on the same core of facts."  Plaintiffs' counsel, therefore, is entitled to a reasonable fee for this litigation because it would be difficult to divide counsel's work on a claim-by-claim basis when all plaintiffs' claims related to the issue of on-grounds passes at Elgin and the Department's policy regarding these passes.  In addition, although plaintiffs brought claims pursuant to both Illinois law and the United States Constitution, they only sought injunctive relief requiring the Department to exercise professional judgment when recommending where clinically appropriate, on-grounds passes.  The trial court granted this type of relief.  Consequently, the fee award should not be reduced simply because counsel did not prevail on the state law claims. 

The Department further disputes the amount of hours and the hourly rate the court awarded plaintiffs' counsel for work performed.  The Department, however, only generally argues that the amount of hours plaintiffs' counsel submitted was not reasonable in relation to the result achieved.  Plaintiffs' counsel obtained significant relief for both current and future NGRI patients at Elgin.  We also believe that the record supports the trial court's calculation of 474.55 hours for counsel's work.  During this litigation, counsel responded to a motion to dismiss, successfully argued this case on appeal, conducted discovery, and participated in a six-day contested trial.  

Moreover, we find that the hourly rate plaintiffs' counsel charged was reasonable in light of the evidence submitted to the trial court.  Plaintiffs' counsel, Mr. Heyrman, is a clinical professor of law at the University of Chicago Law School.  He represents indigent clients.  Public interest work of this nature does not have a standard hourly rate.  As evidence of a reasonable hourly rate, plaintiffs' counsel submitted an affidavit from another attorney who graduated from the same law school class.  This attorney practiced in Chicago and charged a rate of $300 an hour.  Plaintiffs' counsel, however, only charged $250 an hour.  Plaintiffs' counsel also provided evidence of his extensive experience and expertise in mental health law.  The Department presented no evidence to counter plaintiffs' affidavit on an hourly rate or to support its claim that a lower hourly rate would be more reasonable.  The injunction obtained was the precise relief sought regardless of the fact that several counts of the complaint had been dismissed.  Therefore, the trial court did not abuse its discretion in awarding attorney fees to plaintiffs' counsel.

IV. CONCLUSION

We are mindful that the law discourages courts from micro-managing state institutions; however, the record in this case reflects a substantial departure from professional judgment regarding plaintiffs' conditions of confinement.  Based on the record, it was not against the manifest weight of the evidence for the trial court to find that Elgin's policy which eliminated unsupervised on-grounds passes and applied across the board to all NGRI patients failed to demonstrate professional judgment based on accepted standards and practices.  We are also mindful that NGRI patients have committed crimes, and many of these crimes are violent.  Clearly, the public should be protected from the possibility of violent NGRI patients escaping from the mental health institutions where they are confined and undergoing treatment.  Moreover, we recognize that additional safeguards are justified for persons found not guilty by reason of insanity who are involuntarily committed to state mental health facilities.  
People v. Gamble
, 117 Ill. App. 3d 543 (1983).  The purpose of commitment following an insanity acquittal is to treat the patient's mental illness, while protecting the patient and society from the patient's potential dangerousness.  
Williams
, 140 Ill. App. 3d at 228.

We stress that nothing in this opinion should be interpreted as requiring the Department to indiscriminately allow NGRI patients to roam the grounds of Elgin unsupervised.  Rather, in affirming the trial court, we require professional judgment to be exercised when restricting plaintiffs' liberty interests in freedom of bodily movement.  Pursuant to this decision, an NGRI patient may very well be limited to a prescribed area of the Elgin facility and subject to various degrees of supervision.  However, where such limitations restrict the patient’s liberty interests in freedom of bodily movement, the Department is required to exercise professional judgment in imposing such limitations.  The exercise of professional judgment is not limited to, but should include balancing the clinical needs of the NGRI patient with the need for public safety.

Our holding in this case is narrow: the Department shall exercise professional judgment in considering, reviewing, and recommending NGRI patients when clinically appropriate for

unsupervised on-grounds passes.  We finally note that the exercise of professional judgment resulting in recommending any NGRI patient for an unsupervised on-grounds pass shall be subject to review by the criminal court judge, who maintains the power and legal authority to approve, modify or reject these recommendations.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

COHEN, P.J., and McNULTY, J., concur.